232 N.J. Super. 115 (1989)
556 A.2d 796
LAST CHANCE DEVELOPMENT PARTNERSHIP, A NEW JERSEY GENERAL PARTNERSHIP, ET AL., APPELLANTS,
v.
THOMAS H. KEAN, GOVERNOR OF NEW JERSEY, ET AL., RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 6, 1989.
Decided April 7, 1989.
*116 Before Judges J.H. COLEMAN, DEIGHAN and BAIME.
Richard M. Hluchan argued the cause on behalf of appellants (Drinker, Biddle & Reath, attorneys; Richard M. Hluchan and Jerry H. Seidler, on the brief).
Harley A. Williams, Deputy Attorney General, argued the cause for respondents (Peter N. Perretti, Jr., Attorney General, attorney; Deborah T. Poritz, Assistant Attorney General, of counsel; Harley A. Williams, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
The sole issue presented by these appeals is whether the Department of Environmental Protection (DEP) exceeded its *117 statutory authority in promulgating amendments to the Waterfront Development Permit Rules, N.J.A.C. 7:7-2.3. The amendments substantially expand the regulatory jurisdiction of the DEP over upland developments in certain coastal areas. In essence, the challenged regulation requires persons to obtain waterfront development permits as a prerequisite to the construction of any structure in a broadly defined geographic area, encompassing properties far distant from the nearest coastal wetland.
The amendments were originally adopted as an emergency measure following the Governor's certification of the existence of an "imminent peril," thereby authorizing the rule to take effect immediately for a duration of 60 days. After appellants filed a timely appeal, the emergency regulation expired by its own terms, but its essential provisions were carried over and made permanent upon the adoption of N.J.A.C. 7:7-2.3. Appellants immediately filed a separate appeal from the promulgation of the permanent regulation and requested consolidation of the two matters and acceleration of argument. Pursuant to this request, we consolidated the two appeals and directed that they be argued on an expedited basis. Since the emergency rule is no longer in force, we dismiss the original appeal as moot. See Alboum v. Newark, 22 N.J. 571, 572 (1956); City Association of Supervisors v. Board of Education of Newark, 168 N.J. Super. 184, 194 (App.Div. 1979). However, we will consider the combined records in order to insure a complete and thorough review of the common question presented by both appeals. Cf. Riggs v. Long Beach Tp. 101 N.J. 515, 523 (1986), rev'd 212 N.J. Super. 69 (App.Div. 1986), rev'd and remanded 109 N.J. 601 (1988).

I.
Appellants are property owners and developers who, under the amended regulation, are now required to obtain a permit *118 from the DEP before construction of any structures on their land. Under the new regulation, their land is considered "waterfront" property and is thereby subject to the regulatory authority of the DEP. Under N.J.A.C. 7:7-2.3, as amended, the DEP's "waterfront jurisdiction"
extend[s] inland to include an adjacent upland area measured from the most inland beach, dune, wetland or other water area, as these terms are defined in N.J.A.C. 7:7E, to the greater of:
(i) 100 feet; or
(ii) the inland limit of the first property associated with residential, commercial or industrial use that involves a permanent building based on property lines existing on October 3, 1988; provided, however, should the Division issue a waterfront development permit after October 3, 1988 for a use involving a permanent building, upon project completion the inland limit for purposes of this subparagraph shall be the inland property boundary associated with this permit.
The far-reaching effect of the regulation cannot be seriously disputed. The definition of "waterfront" subject to the DEP's regulatory authority includes some properties over one mile away from the nearest wetland. That this is so is best highlighted by appellants' respective properties. Bayshore Associates, for example, owns a 120-acre tract which, although fronting on the Delaware Bay, has an inland depth of some 6,000 feet from the waterline. The prospective buyer of the outermost lots would be required to obtain a waterfront development permit although the nearest coastal water is approximately one mile away. Appellant Frederick W. Schmidt owns two parcels of land which form a single tract of 200 acres. One end of the property fronts on Delaware Bay, but the upland portion commences on Route 47 and runs a distance of 3,090 feet to the closest portion of coastal wet-lands, a distance of over 5,424 feet to the closest high tide line. The subdivision he planned to develop would be located some 4,000 feet away from the Delaware Bay. Sawmill Associates owns a 200-acre tract near Route 47, located 2,600 feet from the high waterline of the Delaware Bay and 3,090 feet away from the Skeeter Island Creek. Last Chance Development Partnership owns two lots approximately 1,263 feet away from the Cape Island Creek. *119 The remaining appellants are also impacted by the amended regulation, but perhaps in less dramatic fashion. Each of these property owners is now required to obtain a waterfront development permit under the amended regulation in order to construct a structure of any kind and any size on his land.
Appellants argue that the regulation is ultra vires because its reach far exceeds the jurisdictional powers conferred upon DEP by the Legislature. It is also claimed that the DEP's assertion of regulatory authority is repugnant to express and specific statutory provisions. We agree with both contentions and are thus constrained to set aside the regulation.

II.
Unfortunately, a somewhat lengthy description of the applicable statutory and regulatory provisions and their history is essential for a complete understanding of the issues presented.

A. The Waterfront Development Act.

Regulation of waterfront development in New Jersey dates back to 1914, when the Waterfront Development Act (N.J.S.A. 12:5-1 et seq.) (Act) was first adopted. The impetus for the enactment of the statutory scheme came from the reports of the New Jersey Harbor Commission, a body appointed by Governor Woodrow Wilson to prepare a study of the port needs of the State and to recommend a policy designed to facilitate commerce and navigation. New Jersey Harbor Commission, Fourth Preliminary Report (1914). See also Board of Commerce and Navigation, Report to the Legislature on the Formation and Operation of the Board (1915). Noting that control over waterfront development was fragmentary and piecemeal, the Commission observed that "there has been no supervision whatsoever over the lay-out of piers and other structures with relation to each other, or to the general commerce of the district and port." New Jersey Harbor Commission, Fourth Preliminary Report at p. 6. The Commission *120 further noted that "the development of New Jersey, industrially, is [retarded] by reason of the failure of the State to adopt any policy for developing its frontage or waterways." Id. at 7. To remedy these evils, the Commission recommended "the appointment of a permanent Harbor Commission with certain well-defined powers over the waterfront and waterways in the State." Id. at 8. See also Newark v. Essex County Board of Taxation, 54 N.J. 171, 174 (1969), cert. den. 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 452 (1969).
The legislative history thus discloses that the principal concern in adopting the Act was to promote commerce and navigation. This articulated objective is also reflected in the express statutory provision empowering the "board of commerce and navigation" to "prevent the encroachment or trespass upon the water front of any of the navigable waters," or upon the riparian lands of this State," and to "restrain" and "remove" any "construction, erection or accretion injurious to the flow of any such waters, which may be detrimental to ... proper navigation... and the maintenance and improvement of commerce...." N.J.S.A. 12:5-2. In a similar vein, the board was directed to "investigate and report annually to the legislature the condition of water-front and harbor facilities ... incident to the movement of commerce upon all navigable rivers and waters" and to recommend measures necessary "for the preservation of proper navigation or its improvement or the improvement of commerce upon such waters." N.J.S.A. 12:5-1. See also New Jersey Harbor Commission, Annual Report, p. 5 (1915).
As we have noted, one of the principal concerns of the Commission was the lack of "supervision ... over the layout of piers and other structures ... with relation to the general commerce of the district and port." New Jersey Harbor Commission, Fourth Preliminary Report at p. 6. In order to combat this problem and to coordinate planning, the Legislature conferred upon the board the power to review proposals for *121 development and improvement of the waterfront. The operative statute, N.J.S.A. 12:5-3, reads as follows:
All plans for the development of any water-front upon any navigable water or stream of this State or bounding thereon, which is contemplated by any person or municipality, in the nature of individual improvement or development or as a part of a general plan which involves the construction or alteration of a dock, wharf, pier, bulkhead, bridge, pipeline, cable, or any other similar or dissimilar waterfront development shall be first submitted to the Department of Environmental Protection. No such development or improvement shall be commenced or executed without the approval of the Department of Environmental Protection first had and received, or as hereinafter in this Chapter provided.[1] [Emphasis added].
For the next 60 years following its adoption, the Act was utilized solely to regulate construction of such things as docks, piers, bulkheads and other structures located below the mean high waterline of navigable waters. At no time during this period did the State ever assert that it had regulatory authority over upland areas above the mean high waterline. In 1951, for example, the Attorney General considered the issue of whether the State could exercise jurisdiction under N.J.S.A. 12:5-3 where a boat basin was to be erected on privately owned upland property adjacent to a navigable waterway. The property owner sought to dredge from the waterway through the mean Ohigh waterline to the privately owned upland area. In a formal *122 opinion, the Attorney General determined "that the State [had] no jurisdiction over that portion of the basin on [the applicant's] upland...." Formal Opinion 1951  No. 1.
Thus, until 1980, the jurisdictional reach of the Act, and more specifically N.J.S.A. 12:5-3, was confined to projects below the mean high waterline of a navigable waterway. In other words, the review powers granted by N.J.S.A. 12:5-3 were considered limited to riparian land (i.e. below the mean high waterline) underlying navigable waterways.

B. The Coastal Area Facility Review Act.

We digress in our review of N.J.S.A. 12:5-3 to describe the next significant development. In 1973, our Legislature enacted the Coastal Area Facility Review Act (N.J.S.A. 13:19-1 et seq.) (CAFRA) finding:
that certain portions of the coastal area are now suffering serious adverse environmental effects resulting from existing facility activity impacts that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State. [N.J.S.A. 13:19-2].
While recognizing these important environmental concerns, the Legislature nevertheless acknowledged the legitimate economic interests of the inhabitants of the coastal area. In this respect, the Legislature declared that CAFRA was designed to strike a balance between protection of the environment and reasonable and appropriate economic development. Ibid. The legislation was thus said:
to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any facilities in the coastal area. [Ibid.].
CAFRA defines the boundaries of the "coastal area" extending roughly from Sandy Hook to Cape May to the Delaware Memorial Bridge, and varying distances up to 20 miles inland from the Atlantic Ocean and Delaware Bay. N.J.S.A. 13:19-4.
*123 In furtherance of the objects of the legislation, N.J.S.A. 13:19-16 directs the Commissioner of the DEP to develop an environmental design strategy, including "a delineation of various areas appropriate for the development of residential and industrial facilities of various types...." The DEP is thus authorized "to adopt, amend and repeal rules and regulations to effectuate the purposes of the act." N.J.S.A. 13:19-17. The statutory grant is to be "liberally" construed, N.J.S.A. 13:19-19, and CAFRA's provisions are not to be regarded "in derogation of any powers now existing," but rather are to be considered "as supplemental and in addition to [authority] conferred by other laws, including municipal zoning authority." N.J.S.A. 13:19-19.
Despite the comprehensive nature of the statutory scheme, the Legislature did not give the DEP "free rein to define `facilities' whether through rulemaking or adjudication, as including all residential, industrial, commercial, or recreational structures with potential adverse environmental effects." State, Dept. of Envir. Protection v. Stavola, 103 N.J. 425, 432 (1986). Instead, CAFRA defines the term "facilities" by including structures designed or utilized for twelve enumerated purposes, and lists 58 specific types of industrial and residential facilities. See N.J.S.A. 13:19-3(c). Included in the definition of "facility" are "[n]ew housing developments of 25 or more dwelling units" and "expansion of existing housing developments of 25 or more dwelling units...." Ibid. CAFRA provides that no "facility" shall be constructed without a permit from the DEP. N.J.S.A. 13:19-5. The definition of the word "facility" contained in N.J.S.A. 13:19-3(c) thus exempts the construction of 24 or fewer dwelling units from the requirement of obtaining a CAFRA permit.
To capsulize, after the enactment of CAFRA, the DEP regulated development in the coastal area in two ways. Any work proposed to be done below the mean high waterline of a navigable waterway required a Waterfront Development permit under the Waterfront Development Act. On the other hand, *124 the construction of any "facility" as defined by CAFRA required a CAFRA permit. And finally, as we have emphasized, housing developments of 24 units or less were exempted from CAFRA's permit requirement.

C. Promulgation of the Waterfront Development Permit Rules.

This was the state of affairs until 1979. At that time, the DEP was in the process of preparing a Comprehensive Coastal Management Program for the entire New Jersey coast, as well as for other areas, in response to the planning mandate of the Federal Coastal Zone Management Act (16 U.S.C. §§ 1451 et seq.) and N.J.S.A. 13:19-16. In conjunction with this effort, the DEP asked whether it could promulgate rules regulating the area 1,000 feet upland of the mean high waterline. The Attorney General responded by defining the word "waterfront" as it appears in N.J.S.A. 12:5-3, as including only the "uplands adjacent to navigable waters or streams." Formal Opinion 1980-No. 6. In his opinion, the Attorney General stated that the DEP, by rulemaking, could regulate "at least the first 100 feet" and perhaps could extend the distance "where the potential area for the first significant land use" goes further inland. He cautioned, however, that such an extension would be "subject to a reasonable maximum distance limitation." Ibid.
Based upon the Attorney General's opinion, the DEP, on September 20, 1980, promulgated the Waterfront Development Permit Rules. In essence, those rules defined the geographic parameters of the DEP's regulatory jurisdiction as follows: (1) in the "coastal area" as defined by CAFRA and within that area regulated by the Hackensack Meadowlands Development Commission, the regulated waterfront continued to be the same as it had been since 1914, i.e., the area regulated only included navigable waterways and all lands lying thereunder up to the mean high waterline (no upland jurisdiction was claimed or asserted), and (2) in non-CAFRA and non-Hackensack Meadowlands areas (i.e., the remainder of the State), the regulated *125 waterfront area consists of that area set forth in (1) above, as well as an "adjacent upland area extending landward from the mean high waterline to the first paved public road, railroad or surveyable property line existing on September 26, 1980, generally parallel to the waterway, provided that the landward boundary of the upland area shall be no less than 100 feet and no more than 500 feet from the mean high waterline." N.J.A.C. 7:7-2.3(a)(2).
Clearly, the reason for treating the coastal area differently from the remainder of the State was the DEP's view that CAFRA comprehensively treated environmental and developmental concerns in this specific geographic zone. This was made abundantly plain in the DEP's comments filed during the rulemaking proceedings. For example, the DEP noted that it had authority to regulate uplands in the "non-coastal area" in contrast to "gaps" in its authority under CAFRA, specifically alluding to "its inability to control the cumulative impacts of developments less than twenty-four units. ..." [Emphasis supplied].
The distinction between coastal areas falling under the purview of CAFRA and others parts of the State was repeated in the Final Environmental Impact Statement for the Coastal Management Program. The DEP again defended the different waterfront standards used in the coastal area and elsewhere. The DEP admitted, as it had consistently in the past, that CAFRA standards "constitute[d] the State's land use priorities within the defined coastal area, and should, therefore, apply to the Waterfront Development Law as administered in that area."

D. The Challenged Amendment.

To recapitulate, until adoption of the recent amendments to N.J.A.C. 7:7-2.3, the DEP asserted regulatory jurisdiction over waterfront development only below the mean high waterline in the coastal area. Upland of the mean high waterline in the *126 coastal area, the DEP regulated only "facilities." It is apparent, however, that the DEP became increasingly frustrated by its inability to combat the cumulative effect of environmental denigration caused by developments of 24 dwelling units or less. Citing a vast array of scholarly studies, see e.g., The Blue Ribbon Panel's Report on the State of the Ocean, pp. 9-10 (1988); Guidelines for Protecting Non-Tidal Wetlands in the Critical Area, Chesapeake Bay Critical Area Commission (1987); Roberson and Horzepa, "New Jersey's Coastal Water Quality Management Program," 7 Journal of Shellfish Research 253 (1988); Silverman, Senstrom and Fam, "Best Management Practices for Controlling Oil and Grease in Urban Stormwater Runoff," 8 The Environmental Professional 351 (1986); Comparison of Economic and Environmental Trends and Projections Between Barnegat Bay, New Jersey, and the Inland Bays of Delaware, Greeley-Polhemus Grove, Inc. (Nov. 23, 1988), the DEP sought to create a "buffer zone" to protect sensitive environmental features from potential harm posed by development. Stated another way, the DEP has attempted to close the gap in its regulatory authority by expanding its permit powers under the Waterfront Development Act, thereby enabling it to combat what it perceives to be the deleterious environmental consequence of CAFRA's exemption of developments of 24 dwelling units or less.

III.
It is against this historical, statutory and regulatory backdrop that we consider the issues presented. Initially, we perceive nothing in the Waterfront Development Act or in its legislative history to support the DEP's assertion of regulatory jurisdiction over broad expanses of land so far distant from any waterway. Indeed, as we have taken pains to point out, the evidence abounds the other way.
We commence our analysis with the well-settled principle that administrative regulations are customarily afforded a rebuttable *127 presumption of validity. See A.A. Mastrangelo, Inc. v. Environmental Protect. Dep't, 90 N.J. 666, 683 (1982); New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561 (1978); Motyka v. McCorkle, 58 N.J. 165, 181 (1971); In re Weston, 36 N.J. 258, 263 (1961), cert. den. 369 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 84 (1962). In a lengthy series of opinions, our Supreme Court has repeatedly stated that "an ultra vires finding is [clearly] disfavored." New Jersey Guild of Hearing Aid Dispensers v. Long, supra, 75 N.J. at 561. See also In re Regulation F-22, Office of Milk Industry, New Jersey, 32 N.J. 258, 261-262 (1960); Flanagan v. Civil Service Department, 29 N.J. 1, 12 (1959). Cf. Franklin v. New Jersey Dept. of Human Services, 111 N.J. 1, 16-17 (1988). Although an administrative regulation "must be within the fair contemplation of the delegation of the enabling statute," Southern Jersey Airways v. Nat. Bk. of Secaucus, 108 N.J. Super. 369, 383 (App. Div. 1970), the legislative grant of authority "is to be liberally construed to enable the agency to accomplish its statutory responsibilities." New Jersey Guild of Hearing Aid Dispensers v. Long, supra 75 N.J. at 562. Toward that end, the courts "readily imply such incidental powers as are [reasonably] necessary to effectuate fully the legislative intent." Ibid. See also In re Suspension of Heller, 73 N.J. 292, 303 (1977); Cammarata v. Essex County Park Comm'n, 26 N.J. 404, 411 (1958). Regulations issued by an administrative agency are "cloaked with a presumption of legitimacy and should be sustained unless clearly ultra vires." Medical Soc. v. N.J. Dept. of Law, 229 N.J. Super. 128, 134 (App.Div. 1988). We thus approach the question raised keenly aware of the limited scope of our review powers.
Within this conceptual framework, our inquiry necessarily focuses upon whether the administrative regulation "falls within the boundaries of the legislative delegation." Ibid. See also Swede v. City of Clifton, 22 N.J. 303, 312 (1956). Administrative action "is of necessity restrained by the declared policy and spirit of the statute and the criteria and standards therein laid *128 down, for a grant thus not confined would constitute a delegation of essential legislative power in contravention of constitutional limitation." Abelson's, Inc. v. N.J. State Board of Optometrists, 5 N.J. 412, 423 (1950). It is a corollary of this principle that the "rule and regulation ... cannot subvert or enlarge upon the statutory policy...." Id. at 424. See also In re Jamesburg High School Closing, 83 N.J. 540, 549 (1980); N.J. Chamb. Commerce v. N.J. Elec. Law Enforce. Comm., 82 N.J. 57, 82-83 (1980). As we said in Medical Soc. v. N.J. Dept. of Law, supra, "[t]he distinction is between the making and the execution of the law." Id. at 135.
Applying these principles, we are firmly convinced that the enabling legislation cannot fairly be read to authorize the DEP's action in this case. While we acknowledge that the Legislature was concerned with the revitalization of the entire waterfront area when it enacted the Waterfront Development Act, it is equally plain that its principal objective was to facilitate navigation and commerce. The Act was not designed to empower the DEP to regulate upland areas distant from any coastal waterway. The legislative history of the Act, which we have recited in detail, clearly compels that conclusion.
Beyond this, the plain meaning of the language employed by the Legislature in granting review powers to the board of commerce and navigation militates strongly against the interpretation presently advanced by the DEP. The word "waterfront" means what it says. It cannot fairly be construed to contemplate vast stretches of land far distant from any waterway or wetland.
In reaching this conclusion, we have accorded substantial deference to the contemporaneous construction, long usage, and practical interpretation given to the Act by the DEP and its predecessors, the administrative agencies charged with enforcement of the statutory scheme. See Smith v. Director, Div. of Taxation, 108 N.J. 19, 25-26 (1987); Malone v. Fender, 80 N.J. 129, 137 (1979); Service Armament Co. v. Hyland, 70 N.J. 550, *129 561 (1976); The Passaic Daily News v. Blair, 63 N.J. 474, 484 (1973); Pringle v. N.J. Dept. of Civil Service, 45 N.J. 329, 332-333 (1965). An agency's construction of a statute over a period of years without legislative interference will generally be granted great weight as evidence of its conformity with the legislative intent. Malone v. Fender, supra, 80 N.J. at 137; Automatic Merchandising Council v. Glaser, 127 N.J. Super. 413, 420 (App.Div. 1974); Lavitz v. Civil Serv. Comm., 94 N.J. Super. 260, 266 (App.Div. 1967); Housing Auth. of Jersey City v. Dept. of Civil Service, 87 N.J. Super. 146, 149 (App.Div. 1965); Walsh v. Dept. of Civil Service, 32 N.J. Super. 39, 48-49 (App.Div. 1954). Here, as we have pointed out, from 1914 until 1980, the State never claimed regulatory authority over upland areas under the statute. Moreover, since 1980, the DEP has only regulated uplands adjacent to navigable waterways outside of the coastal area, and then, solely narrow strips of land immediately contiguous to such waterways. For some 74 years, the State has never claimed the right to regulate upland areas so far distant from waterways under N.J.S.A. 12:5-3.
Most importantly, this omission was not the result of administrative inertia. As we have emphasized, the question of the reach of N.J.S.A. 12:5-3 was repeatedly considered within the executive branch and the statute was interpreted accordingly. We are thus not concerned with a passive acceptance of a limited statutory construction. Rather, the Governor's chief legal officer has affirmatively acknowledged the confined boundaries of regulatory authority under the Waterfront Development Act over a period of years in a series of Formal Opinions.
Before leaving the subject, one further matter deserves consideration. We point out that not only has the Legislature not "interfered" with the DEP's longstanding construction of N.J.S.A. 12:5-3, but more significantly, it affirmatively recognized that the review powers previously granted under the Waterfront Development Act did not encompass development of upland areas when it enacted CAFRA. We must assume that the *130 Legislature was thoroughly conversant with its own legislation and the administrative construction placed thereon. See Quaremba v. Allan, 67 N.J. 1, 14 (1975); In re Keogh-Dwyer, 45 N.J. 117, 120 (1965); Barringer v. Miele, 6 N.J. 139, 144 (1951). Had the Legislature believed it had granted broad review powers to the DEP by reason of N.J.S.A. 12:5-3, it would not have found it necessary to enact CAFRA. As we have pointed out, CAFRA does not require a permit with reference to a development of 24 dwelling units or less. Given the environmental concerns which prompted the Legislature to enact CAFRA, it is inconceivable that the Legislature intended to take from the DEP a regulatory power it had previously given under the Waterfront Development Act. But that conclusion would inexorably follow were we to adopt the DEP's interpretation of the Waterfront Development Act. We reject that unsound thesis. Rather, in our view, the only viable conclusion is that the Legislature never granted such authority when it enacted the Waterfront Development Act, and hence the need for CAFRA.
Our examination of the legislative history of CAFRA bolsters this conclusion. Prior to the enactment of CAFRA, it is obvious that the Legislature viewed the permit requirement of the Waterfront Development Act as applying only to the construction of structures below the mean high waterline or, at the most, the narrow strips of land contiguous to waterways. The broad power to review and supervise development along the coast was considered to be purely a municipal function. The State played no role at all in that endeavor. CAFRA was intended to fill the vacuum and provide the State with a modicum of supervisory responsibility. That this is so is best evidenced by the testimony of the then Commissioner of the DEP, who apparently drafted the original bill. At the public hearings, the Commissioner stated "[e]ssentially what this bill does is describe an area which we think, because of its special character, should have at least a review mechanism at the State level for future development." [Emphasis supplied]. *131 Transcript of the Public Hearing Before New Jersey Legislature's Assembly Committee on Air and Water Pollution and Public Health on Assembly Bill No. 1427, p. 36 (Dec. 11, 1972). He went on to add that "[w]hat the bill provides for is a review [at the State level], before construction, from an environmental point of view, of those developments that otherwise would be [supervised] by the local government." Id. at 37. Had the Legislature granted such State review powers under the Waterfront Development Act, there would have been no need to enact CAFRA.
We thus conclude that the DEP exceeded the scope of its statutory authority under N.J.S.A. 12:5-3 when it promulgated the most recent changes to N.J.A.C. 7:7-2.3. The regulation must be set aside on that basis.

IV.
We also agree with appellants' argument that CAFRA's exemption from its permit requirement, with respect to developments of 24 dwelling units or less, serves to preempt the DEP's assertion of regulatory jurisdiction over upland areas in the coastal region.
As we have pointed out, it is clear from the broad purposes of CAFRA (N.J.S.A. 13:19-2), as well as the charge given to the DEP in N.J.S.A. 13:19-16, that the legislation is expansive in scope. The DEP was assigned by the Legislature to achieve CAFRA's important purpose of protecting our fragile coastal area from adverse environmental impact. State, Dept. of Envir. Protection v. Stavola, supra, 103 N.J. at 431. Toward that end, the Legislature delegated substantial power to the DEP.
However, the authority so granted is not without limit. We again allude to the statement of our Supreme Court in State, Dept. of Envir. Protection v. Stavola, supra, that the DEP was not given "free reign to define `facilities'" subject to its *132 regulatory power. Id. 103 N.J. at 432. Instead, the Legislature provided a detailed description of the types of facilities which could be regulated. See N.J.S.A. 13:19-3(c). Almost every land use on the lengthy list is a potential abuser of the ecosystem, wherever located, and especially in an environmentally fragile area. What is equally apparent, however, is that not all environmentally dangerous uses are encompassed in the definition of "facilities." Among the omissions are large commercial uses, office complexes, large storage facilities, restaurants, amusement parks, stadiums, race tracks and heavy industrial and manufacturing uses. See State, Dept. of Environmental Protect. v. Stavola, 206 N.J. Super. 213, 225 (App.Div. 1985) (Cohen, J.A.D., dissenting). It is plain that the Legislature did not try to list as "facilities" all uses with potential environmental impact. Most importantly for the purposes of this appeal, developments of 24 dwelling units or less were omitted from the list of uses subject to CAFRA's permit requirement. Significantly, the DEP tacitly acknowledged this omission in its detailed description of the types of developments falling within the purview of the definition of "facilities." See N.J.A.C. 7:7-2.1(b)(4).
It thus cannot be said that the Legislature inadvertently left a hole in an otherwise seamless fabric. State, Dept. of Envir. Protection v. Stavola, supra, 206 N.J. Super. at 225. It is clear beyond peradventure that the omission was deliberate. Succintly stated, the Legislature purposely exempted developments of 24 dwelling units or less from the jurisdictional reach of the DEP.
Even were we to accept the DEP's argument that it is otherwise vested with the authority to regulate upland areas under the Waterfront Development Act, the specific exemption CAFRA granted to developments of 24 dwelling units or less *133 would prevail in the coastal area.[2] It is only logical to conclude that the Legislature must have had the Waterfront Development Act in mind when it subsequently adopted the specific exemption of CAFRA, and intended that the limitation in the latter statute would apply. See, e.g., W. Kingsley v. Wes Outdoor Advertising Co., 55 N.J. 336, 339 (1970). This is so because "[w]hen there is a conflict between a general and a specific act on the same subject, the latter shall prevail." Ibid. See also State, by Highway Com'r v. Dilley, 48 N.J. 383 (1967); State v. Hotel Bar Foods, Inc., 18 N.J. 115 (1955); Goff v. Hunt, 6 N.J. 600 (1951); Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157 (1949). In this respect, principles of statutory construction support preference of a more specific and more recently enacted section of a statute as an intrinsic aid in the search for legislative intent. Lower Main Street Associates, etc. et al. v. New Jersey Housing and Mortgage *134 Fin. Ag., et al., 114 N.J. 226, 231 (1989). State v. One 1976 Pontiac Firebird, 168 N.J. Super. 168, 176 (App.Div. 1979); Newark v. Dept. of Civil Service, 68 N.J. Super. 416, 427 (App.Div. 1961); Perry v. Swedesboro, 204 N.J. Super. 103, 112 (Law Div. 1985), aff'd 214 N.J. Super. 488 (App.Div. 1986). Statutes in pari materia, although in apparent conflict, are so far as reasonably possible, construed to be in harmony with each other. But if there is an irreconcilable conflict between the new provisions and the prior statutes, the former will control as it is the later expression of the legislature. 2 Sutherland, Statutory Construction (3d ed. 1983), § 5201, p. 531. That principle has particular efficacy here because CAFRA, the later and more recently enacted legislation, was intended to be comprehensive and all-inclusive as it applies to the coastal region.
Of course, we recognize that CAFRA, by its very terms, is "not to be regarded as to be in derogation of any powers not existing and [is to be considered] as supplemental and in addition to powers conferred by other laws, including municipal zoning authority." N.J.S.A. 13:19-19. As we have pointed out, however, when this provision was enacted in 1973, there were no other statutory powers then being exercised by the DEP with which CAFRA could interfere. We again allude to the chronology described previously which discloses that the Waterfront Development Act was then applied only to regulate structures below the mean high waterline. Thus, CAFRA regulation of upland areas in no way conflicted with this law since neither in 1914 nor 1973 did the DEP exercise any Waterfront Development jurisdiction over uplands in the coastal areas.
In any event, there would be no reason for the Legislature to have expressly restricted CAFRA's permit requirement to developments of 25 dwelling units or more, unless smaller developments were intended to be exempted from the DEP's regulatory authority. In this respect, we again allude to our duty to *135 accord substantial deference to the longstanding administrative construction of the two statutes by the DEP. As we stressed in our discussion of the history of waterfront regulation, the DEP, until only recently, interpreted CAFRA as preempting whatever regulatory authority it otherwise possessed under the Waterfront Development Act with reference to the coastal area.
Finally, we observe that we are not writing on a blank slate. Our Supreme Court has had occasion to construe CAFRA's provisions in several cases. See, e.g., State, Dept. of Envir. Protection v. Stavola, supra; Crema v. New Jersey Dept. of Environmental Protection, 94 N.J. 286 (1983). In Crema, supra, 94 N.J. at 303 the Court held that a permit granted in the form of a conceptual approval was not authorized by any express CAFRA provision. In State, Dept. of Environmental Protect. v. Stavola, supra, 103 N.J. at 438-439 the Court decided that, absent duly promulgated regulations, the construction of 134 beachfront cabanas did not constitute a development of 25 or more dwelling units and was thus not subject to CAFRA's permit requirement. We point out that if, as the DEP now contends, it had regulatory authority over upland developments in the coastal area under the Waterfront Development Act, all of this litigation would have been wholly unnecessary. In other words, our Supreme Court's prior labors on the subject would have been in vain.

V.
To summarize, we find that (1) the Waterfront Development Act does not authorize DEP regulation of upland areas in the coastal area and (2) CAFRA's more specific and later exemption of developments of 24 dwelling units or less must, in any event, prevail.
Accordingly, the amendments to N.J.A.C. 7:7-2.3 are ultra vires and are thus set aside.
NOTES
[1] This statute has been amended only twice since its original enactment as L. 1914, ch. 123, § 4. In 1975, an amendment substituted "Department of Environmental Protection" for the term "board," which referred to the former Board of Commerce and Navigation which was a predecessor to DEP. See L. 1975, ch. 232, Section 8. Moreover, by L. 1981, ch. 315, § 1 effective December 3, 1981, the Legislature added subsection (b) which exempted from the Waterfront Development Law "(1) the repair, replacement or renovation of a permanent dock, wharf, pier, bulkhead, or building existing prior to January 1, 1981, provided the repair, replacement or renovation does not increase the size of the structure and the structure is used solely for residential purposes or the docking or servicing of pleasure vessels;" and (2) "the repair, replacement or renovation of a floating dock, mooring raft or similar temporary or seasonal improvement or structure, provided the improvement or structure does not exceed in length the waterfront frontage of the parcel of real property to which it is attached and is used solely for the docking or servicing of pleasure vessels." We will discuss the 1981 amendment in greater detail later in our opinion.
[2] In asserting that the Waterfront Development Act grants regulatory authority over upland areas, the DEP relies upon an amendment which was adopted in 1981. See L. 1981, c. 315, § 1. The amendment states:

The following are exempt from the provisions of subsection (a) of this section:
(1) The repair, replacement or renovation of a permanent dock, wharf, pier, bulkhead or building existing prior to January 1, 1981, provided the repair, replacement or renovation does not increase the size of the structure and the structure is used solely for residential purposes or the docking or servicing of pleasure vessels. [N.J.S.A, 12:5-3(b)(1) (emphasis added)].
The DEP claims that the 1981 amendment to N.J.S.A. 12:5-3 is evidence of a legislative intent to regulate single family dwellings. Just the opposite is true. The DEP's 1980 Waterfront Permit Rules (effective only in the non-CAFRA area) purported to regulate the construction and reconstruction of single family dwellings on the waterfront. In response to a public outcry, the Legislature enacted the above-cited amendment to strip the DEP of jurisdiction over the reconstruction, repair or renovation of any dwelling existing prior to January 1, 1981. Thus, contrary to the DEP's claim, the amendment limited, rather than expanded, its jurisdiction. In any event, the amendment only applied to the non-CAFRA area, since the DEP has never before regulated in the CAFRA area pursuant to N.J.S.A. 12:5-3. In light of CAFRA's exemption of developments of 24 dwelling units or less, there was no need for the Legislature to adopt the amendment to N.J.S.A. 12:5-3, as it relates to the coastal area.