243 N.J. Super. 349 (1990)
579 A.2d 817
FRANK A. ANFUSO AND ANNE M. ANFUSO, PLAINTIFFS-APPELLANTS,
v.
KEITH T. SEELEY, CAROL L. SEELEY AND BOARD OF ADJUSTMENT OF THE BOROUGH OF OCEANPORT, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 1990.
Decided August 21, 1990.
*350 Before Judges KING, SHEBELL and KEEFE.
*351 Gary E. Fox argued the cause for the appellants Frank A. Anfuso and Anne M. Anfuso (Fox & Mc Govern, attorneys; Mitchell J. Ansell, on the brief).
William J. O'Hagan, Jr. argued the cause for the respondents, Keith T. Seeley and Carol L. Seeley (Stout & O'Hagan, attorneys; William J. O'Hagan, Jr., and Scott R. Baron, on the brief).
Patricia A. Heffernan argued the cause for the respondent, Board of Adjustment of Oceanport (Heffernan & Wersinger, attorneys).
The opinion of the court was delivered by KEEFE, J.A.D.
The issues presented on this appeal require us to address the zoning power of a municipality as it relates to federal and State regulation of navigable water and tidal land within the municipality.
Plaintiffs Frank A. and Anne M. Anfuso appeal from a Law Division judgment that affirmed the decision of defendant Board of Adjustment of the Borough of Oceanport (Board) to grant a use variance and several ancillary bulk variances to defendants Keith A. and Carol L. Seeley enabling the Seeleys to expand their marina, a prior conforming use. The judgment under review is affirmed in all respects except that part of the judgment that approved the Board's decision granting the Seeleys "other incidental" and unspecified variances required by them "to continue to utilize the premises presently operated as a marina."
The Seeleys are owners and operators of a marina known as "Oceanport Landing" located at the foot of River Street in the Borough of Oceanport (Borough). To the south, the marina is bordered by the Shrewsbury River (Branchport Creek) and to the east, by Bridge Creek. The marina is located in an R-3 residential zone. Although neither party has annexed the applicable zoning ordinance, there is no dispute that a marina is not *352 one of the permitted uses in the R-3 district. The marina is situated on two different lots, lot 16, block 61 and lot 18, block 1.
A brief history of the use made of the two lots presently owned by the Seeleys is necessary to an understanding of the litigation. The following facts are taken from extensive findings of fact made by the Board in its resolutions, which findings are supported by the testimony, and from the record itself where supplementation was found necessary.
In March or June 1983, the Seeleys purchased the marina from Mr. and Mrs. Harry Wilson. The Wilsons had, in turn, purchased the marina from Willis Woods in the 1960s. Woods had operated a marina on lot 16 consisting of a machine shop, a boat storage yard, boat slips and docks since 1928. Sometime in the 1950s, Woods built the existing structure on lot 18, and resided there.
During the time period in which the Wilsons owned the lots, a fire destroyed a building used for boat storage on lot 16. They then used the structure on lot 18, as an office in conjunction with marina operations. This history is important because when the Seeleys purchased the lots in 1983 they believed that the use of both lots as a marina was permitted and were assured by Borough officials that the marina, including both lots, was a nonconforming use that predated the Borough's first zoning ordinance enacted in 1954. Consequently, the Seeleys considered the marina to be "grandfathered in" without the need for a variance.
However, in 1984, after the Seeleys had constructed additional boat slips, two floating docks and increased the number of boats that had previously been stored on lot 18, they received a series of letters from the Borough zoning officer stating that because the Seeleys had "expanded" the marina use on lot 18, a variance would be required to continue such use. Evidently, plaintiffs Frank and Anne Anfuso, who reside directly across *353 Bridge Creek from the marina, were not pleased with the new facilities on lot 18 and so notified the Borough zoning official.
Thereafter, in December 1985, the Seeleys applied to the Oceanport Board of Adjustment for an interpretation pursuant to N.J.S.A. 40:55D-70a, inquiring whether their use of lot 18 for docking, boat storage and vehicle parking in conjunction with the operation of the marina constituted a pre-existing nonconforming use.[1] Following several hearings, the Board determined that the use of lot 18 was not "a pre-existing, non-conforming use" but, instead, constituted "an expansion" of a nonconforming use that required a variance. The Board permitted the Seeleys to continue the marina operations but directed them to apply for a variance within six months from the date the resolution was adopted.
Significantly, the Board declined to make any factual findings regarding the legality of the two docks jutting into the Shrewsbury River that had been installed on lot 18. The Board was of the opinion that the Legislature had preempted its jurisdiction with regard to the structures placed in the water. Presumably, the Board arrived at that conclusion following the Borough zoning officer's testimony that he had been advised by the municipal attorney that the municipality had no zoning authority over the waterways surrounding Seeleys' property.
Thereafter, the Seeleys applied to the Board for a use variance and several ancillary bulk variances in order to operate the marina on lot 18. Public hearings were conducted before the Board beginning in January 1986 and continuing through June 1987.
Keith Seeley testified that prior to purchasing the two adjacent lots he had spoken with the zoning officer and the Borough *354 administrator and had been assured that the marina, operated on both lots, was a pre-existing nonconforming use. He had also examined the municipal tax records and noted that both lots had been taxed as a commercial marina. Seeley also testified that, if his variance requests were granted, there would be no structural changes made to the property and, essentially, that the marina would operate as it had since he purchased it in 1983. At the time of the Board hearings, lot 18 included 75 boat slips offshore and was used to store approximately 150 to 175 boats in the off-season.
By this time the Seeleys had obtained all of the federal and State permits necessary for operation of the marina. Effective March 15, 1985, the United States Army Corps of Engineers issued a permit authorizing the construction of a new bulkhead, installation of an "L-shaped" timber pier and installation of two floating docks in the Shrewsbury River.[2]
The Seeleys also secured a five-year license from the Tidelands Resource Council (TRC) of the State Department of Environmental Protection (DEP), Division of Coastal Resources on July 2, 1984. The license permitted the Seeleys to "use and maintain a proposed expansion of an existing marina facility in the Shrewsbury River, outshore of Lot 18, Block 1, on River Street in the Borough of Oceanport, Monmouth County, New Jersey situate[d] upon the lands of the State under water...." Seeley testified that when he applied to the TRC for a riparian lease, the Borough and the Oceanport Planning Board were notified and received a detailed plan of the proposal. Evidently, neither the Borough nor the planning board objected to the application.
*355 George Cosentino, Jr., a landscape architect, testified on behalf of the Seeleys. He maintained that a buffer of Japanese black pines, strategically placed on the lot, would adequately screen the marina from plaintiffs' property. Frank Anfuso later testified that he did not object to the use of the property as a marina per se. He simply did not like the view of the marina and the boats stored there from his property located across Bridge Creek.
John Haberstroh, a New Jersey licensed real estate broker, stated that he specialized in the sale of marinas and that the marina industry was economically and environmentally important to the State of New Jersey. He maintained that there was a State shortage of existing boat slips because there were at that time approximately 30,000 boat slips for 200,000 registered boats. Haberstroh also said that there were approximately 350 marinas in New Jersey and that the DEP encouraged the expansion of marina facilities. He maintained that in recent years the number of marinas had declined due to the proliferation of waterfront condominium development. In his opinion, the marina enhanced the value of the surrounding residential properties.
R. Lee Hobaugh, a New Jersey licensed professional planner also testified for the Seeleys. Hobaugh had reviewed several DEP and Coastal Area Facility Review Act (CAFRA) policy papers and stated that those documents evinced the State's policy to expand and improve existing marinas rather than to create new ones. Hobaugh asserted that only three percent of the State's remaining water-edge areas were suitable for water-dependent recreational uses. In addition, Hobaugh said that State policy encouraged restricting the residential redevelopment of sites currently or recently occupied by a water-dependent use. He also pointed out that the preservation of boat slips available to the public is encouraged to protect the public's common law right to use tidal waters for navigation.
*356 Hobaugh maintained that the DEP has singled out marinas for special consideration because marinas attract tourists and serve the estimated 25% of New Jersey residents who go boating in the State's coastal waters. He also maintained that State policy favors water-edge marina development  a use that is water-dependent, as opposed to a single-family residential use that is not. He concluded that, in his opinion, the application should be granted in all respects because marina operations are presently conducted at the site and because the granting of the application would not be a substantial detriment to the public good.
For their part, plaintiffs called John Cattanach, a real estate appraisal expert, in support of their position that the variance request should be denied. Essentially, Cattanach maintained that lot 18 could be successfully subdivided into four residential building lots. Without elaboration, he asserted that the construction of a pier had diminished the value of plaintiffs' property.
Robert Strong, a professional planner licensed in New Jersey, testified, contrary to the opinion of Seeleys' expert planner, that although "special reasons" may exist to satisfy the statutory positive criteria, these reasons were insufficient to overcome the negative aspects of the Seeleys' application. That is, Strong believed that the Marina constituted an intrusive commercial use of the property in an almost exclusively residential area. In his opinion, the marina generated additional and unwanted noise and traffic in the vicinity of the residential homes.
During the course of cross-examination, Strong agreed that the waters adjacent to Seeleys' property up to the mean high water mark were tidal waters and that State policy dictates that the State's citizens should have access to those waters. Although Strong conceded that the State has articulated a need for additional public marinas and boat slips, he believed that this "special reason" could not overcome the abrogation of the *357 Borough zone plan that the granting of the Seeleys' application would cause.
During the course of the Board hearings, several neighboring property owners testified in support of the variance request. They generally maintained that the marina was run efficiently and that they enjoyed viewing the boats located on the property and the convenience of a marina located in town.
On June 24, 1987, the Board voted unanimously to grant the Seeleys' use variance application. In its seven-page resolution of August 5, 1987 memorializing its decision to grant the use variance, the board found that: (1) State policy mandates that existing marinas should be "maintained by [sic] expanded in order to serve the general welfare by providing for the recreational use of the waterways of the State of New Jersey"; (2) neighboring property owners asserted that the marina operations did not negatively impact on the residential quality of the neighborhood; (3) applicants suffered a hardship because municipal representatives had erroneously advised them that the subject property could be used as a marina; (4) the site was particularly suited for use as a marina; and, (5) the relief requested by applicants could be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the municipal zone plan and zoning ordinance.
Following its decision to grant the use variance, public hearings were held regarding the request for various bulk variances attendant to the use variance and for site plan approval. Specifically, the Seeleys requested a variance from: (1) the municipal street-line setback ordinance (Section 68-13(B)); (2) the municipal natural waterline setback ordinance (Section 68-13(B)); (3) the requirement that a use not constructed within a completely enclosed building be surrounded by a fence or hedge (Section 68-15(B)); (4) the requirement that a building shall not be located within 200 feet of any boundary of a residential zone (Section 68-18(B)(2)); (5) the requirement that unenclosed recreational *358 facilities shall be screened and located not less than 200 feet from any residential zone boundary, except where greater distances are otherwise required (Section 68-18(B)(4)); (6) the requirement to provide off-street parking facilities (Section 68-18(C)); and, (7) any other variances that may be required to continue to utilize the building located on lot 18 for marina operations and to continue to store boats on the premises.
Daniel Seymour, an engineer, testified on behalf of the Seeleys' application. He offered a general description of the site and noted that the Seeleys planned to add a row of Japanese black pine trees along the property's eastern boundary with a six-foot high fence in order to provide screening of the boat storage area. In the summer months, the boat storage areas would be removed and replaced with parking areas.
In addition, G. Dean McAdoo, an acoustics and vibrations consulting engineer, testified that he had conducted a noise study of the marina in May 1987 and found that the noise level emanating from the marina did not violate State noise standards established by the DEP. His testimony was not refuted. On December 2, 1987, the Board voted to grant all of the bulk variances requested and approved the site plan subject to certain conditions.
Plaintiffs commenced a prerogative writ action challenging the Board's decision to grant the use and bulk variances. After hearing oral argument and reviewing the record before the Board, the Law Division judge, in a letter opinion, concluded that the Board's findings were supported by the evidence presented. However, the judge found that the Borough's zoning ordinance, which purportedly extended the zoning boundaries beyond the high water mark to the center of the waterway, was illegal. She remanded the matter to the Board with certain instructions to be discussed more fully later in this opinion.
In compliance with the judge's directive, the Board adopted a resolution on March 1, 1989, in which it found "that the zoning *359 district boundary line applicable to Block 1, Lot 18 is coterminous with the mean high water line" as shown on the site plan. Further, the Board found that the docks installed by the Seeleys were beyond the mean high water line that "runs the existing bulkhead north of the eastern most floating dock" and "along the bulkhead line in a general westerly direction for the remainder of the waterfront to a point west of River Street." Consequently, the Board determined that it had previously fully considered the Seeleys' request because it had "considered all of the area from the land portion of the premises to the mean high water line."
On March 22, 1989, the trial judge, who had retained jurisdiction of the matter, entered an order of final judgment affirming the Board's decision to grant the application for use and ancillary bulk variances and site plan approval. Plaintiffs appeal from that decision.

I
The plaintiffs contend that two decisions were made concerning State and federal preemption of the Board's power to exercise zoning prerogatives over State tidal lands and navigable waters which were "clear error[s] in law and as such ... resulted in an incomplete and inadequate review of the Seeleys' application." The first challenged decision was made by the Board in its June 4, 1986 resolution in which it determined that the Seeleys were required to apply for a use variance, but that "the Legislature has pre-empted the Board's jurisdiction as regard the docks at the subject premises, and, accordingly [the Board] makes no finding as to the continued use of same by the applicant." Plaintiffs argue that there was no such preemption and that the Board "erred by not extending their power beyond the high water mark, ...."
The second decision challenged by plaintiffs occurred when the trial judge held that the Borough's zoning power stopped at the high water mark and that its "attempt to zone beyond the *360 high water mark is ... ultra vires." Plaintiffs argue that "this entire appeal hinges on this threshold issue," and, if those two decisions were legally wrong, "the Seeleys' application would have to fail."[3]
We agree with plaintiffs that neither the State nor federal legislatures intended to preempt the municipalities' authority to regulate land use within its borders under the Municipal Land Use Law, N.J.S.A. 40:55D-1 to 112, by reason of its passage of the State Water-Front and Harbor Facilities Act or federal Clean Water Act and, for that reason, zoning districts do not end at the mean high water level where State owned land begins and private property ends. However, our review of the record satisfies us that these legal errors do not require a reversal and remand to the Board for further consideration. The reasons for this conclusion follow.
The use variance applied for by the Seeleys was for lot 18. The southern and eastern boundaries of the lot abut tidal waters of the Branchport Creek (south) and Bridge Creek (east); both creeks are apparently within the municipal boundaries of Oceanport. It is clear that the State owns all "land flowed by tidal waters, which extend to the mean high water mark." Matthews v. Bay Head Imp. Ass'n., 95 N.J. 306, 312, 471 A.2d 355 (1984), cert. den. 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). Thus, the eastern and southern limits of lot 18 are defined by the highwater mark. The State owned land under the tidewater has no lot or block designation on the *361 municipal map and, as pertains to this case, was described by the TRC as that property "outshore" of lot 18.
No person may fill in, build upon or claim any State-owned tidelands without an appropriate grant or lease from the State. N.J.S.A. 12:3-4, -7, -10, -12. The TRC has statutory authority to entertain and act upon such application pursuant to N.J.S.A. 13:1B-13, and in performing that function is required by statute to give "due regard to the interests of navigation." N.J.S.A. 12:3-10. The TRC's concern for navigation is undoubtedly an acknowledgement of the federal interest in navigable waters, U.S. Const. Art. 1, § 8, cl. 3, Art. 3, § 2, cl. 1, and a desire to avoid any conflict triggered by the Supremacy Clause. U.S. Const. Art. 6, cl. 2.
Applications by riparian owners for grants, leases or licences, to fill or build upon State tidelands are also addressed in great detail by regulations promulgated by the DEP under the authority conferred upon it by N.J.S.A. 12:5-3, the "Water-Front and Harbor Facilities Act" (Act). That particular section of the Act requires the grantee, leasee or licensee of State tideland to submit plans for the proposed development to the DEP for approval. N.J.A.C. 7:7-1.1 to -6.4 are the regulations specifically addressing the procedure by which permit applications are made under the Act. N.J.A.C. 7:7-1.1.[4] The TRC specifically conditioned the Seeleys' license to use State lands flowed by the tide upon obtaining a permit under the aforesaid statute and regulations.
This license is made subject to the limitation that the licensee herein shall not improve or develop the above described lands flowed by tide nor appropriate said lands to their own exclusive use unless and until a permit, pursuant to N.J.S.A. 12:5-3, is obtained for that purpose.
*362 There is nothing in the Act nor in the regulations pursuant to the Act that evidences an intent to preempt land use regulation by municipalities under the MLUL. Indeed, the regulations express a contrary intent.
The provision of CAFRA, the Wetlands Act, and the Waterfront Development Law are supplemental to other laws, including the Municipal Land Use Law (N.J.S.A. 40:55D-1 et seq., P.L. 1975, Chapter 291). Early consultation with the Division by a prospective applicant can avoid unnecessary duplication and delay in development review at the state and local levels for the same facility, if applications for proposed facilities are processed at the same time at the State and local levels. [N.J.A.C. 7:7-4.1(a)].
The interpretation of a statute by the agency charged with its administration and enforcement is afforded substantial deference. Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 843 n. 11, 844, 104 S.Ct. 2778, 2782 n. 11, 2783, 81 L.Ed.2d 694, 703 (1984); Somers Associates, Inc. v. Gloucester Township, County of Camden, 241 N.J. Super. 323, 575 A.2d 20 (App.Div. 1990). Moreover, in this case the May 9, 1984 minutes of the TRC reflect the comity with local zoning interests fostered by the regulations. In granting the license to the Seeleys the TRC raised the question of whether the Seeleys would require a use variance and further stipulated that "[t]he license is to contain language stating that the action taken by the State does not compel any action by the municipality."
As indicated earlier, the same regulations apply to CAFRA permits. In a case involving a CAFRA application, this court found "no unlawful conflict or preemption problem between the permit power granted to the Commissioner and the zoning power of the municipality which governs the project.... To require a developer to comply with local zoning regulations pertaining to land use and also to comply with use regulations designed to protect state environmental resources is not violative of any constitutional mandate." Toms River Affiliates v. Department of Envtl. Protection 140 N.J. Super. 135, 146, 355 A.2d 679 (App.Div. 1976), certif. den. 71 N.J. 345, 364 A.2d 1077 (1976).
*363 Thus, it is clear that the State has not attempted to preempt local zoning considerations by passage of the Act or the regulations promulgated pursuant thereto, nor can we find any basis to conclude that federal preemption exists in this context. In connection with their construction of additional dock facilities at the marina, the Seeleys obtained a permit from the Army Corps of Engineers pursuant to 33 U.S.C.A. § 403, effective March 15, 1985, permitting them to perform work in or affecting navigable waters in the United States, and the Clean Water Act, 33 U.S.C.A. § 1344, permitting them to discharge dredged or fill material into waters of the United States. The permit in question expressly provides the following general condition: "This permit does not obviate the requirement to obtain state or local assent required by law for the activity authorized herein."
By concluding that municipal zoning considerations are not totally preempted where waterfront development permits are involved we do not mean to suggest that a municipality's power to regulate land use can be considered in a vacuum without reference to applicable federal and State statutes and regulations. Rather, the legislative design is to allow municipal land use considerations to co-exist with federal and State regulations to the extent that they are compatible. Where, however, local interests collide with expressed policy goals of State and federal legislation local zoning interests must yield. Garden State Farms, Inc. v. Mayor Louis Bay, II, 77 N.J. 439, 454, 390 A.2d 1177 (1978); Rutgers v. Piluso, 60 N.J. 142, 286 A.2d 697 (1972).[5]
In Lusardi v. Curtis Point Prop. Owners Ass'n, 86 N.J. 217, 430 A.2d 881 (1981), defendant Association, a group of homeowners from a bayside development, owned an oceanfront lot which it used for the recreational purposes of its members. However, Brick Township zoned that lot and all other oceanfront *364 lots along its eastern border exclusively for single family residential use. Abutting landowners obtained an injunction against the Association. The Association then challenged the validity of the zoning ordinance. In affirming the trial court judgment invalidating the ordinance, the Supreme Court said:
Ordinarily municipal officials have wide discretion in determining what uses are suitable for each district, and they need not provide for a particular use in a specified vicinity or for every appropriate use within the borders of the municipality. See, e.g., Fanale v. Borough of Hasbrouck Heights, 26 N.J. 320, 325 [139 A.2d 749] (1958). But this principle must be qualified where land has a unique character and a statewide policy designates what uses are appropriate for such land. Statewide policies are relevant to zoning decisions because municipalities exercise zoning power only through delegation of the State's authority and they must consider the welfare of all the State's citizens, not just the interests of the inhabitants in the particular locality. See [Southern Burlington County N.A.A.C.P. v.] Mt. Laurel, supra, 67 N.J. [151] at 178 [336 A.2d 713 (1975).] Local planning decisions must be consistent with statewide policies concerning land use and resource allocation. [Lusardi, 86 N.J. at 227, 430 A.2d 881].
It is appropriate to note at this juncture that, in granting a license to the Seeleys, the TRC was required to observe certain "substantive policies [promulgated by] the Department of Environmental Protection regarding the use and development of coastal resources, ...." N.J.A.C. 7:7E-1.1; N.J.A.C. 7:7E-1.2(b), (f). These policies, known as the Coastal Resource and Development policies
represent the consideration of various conflicting, competing, and contradictory local, State, and national interests in diverse coastal resources and in diverse uses of coastal locations. Numerous balances have been struck among these interests in defining these policies, which reduce but do not presume to eliminate all conflicts among competing interests. One reason for this intentional balancing and conflict reducing approach is that coastal management involves explicit consideration of a broad range of concerns, in contrast to other resource management programs which have a more limited scope of concern. [N.J.A.C. 7:7E-1.5(b)].
The standards pertaining to recreational docks and piers, such as were proposed by the Seeleys, are found in N.J.A.C. 7:7E-4.11(e). Such facilities, in order to be approved, must satisfy the TRC that:
i. There is a demonstrated need that cannot be satisfied by existing facilities;

*365 ii. The construction minimizes adverse environmental impact to the maximum extent feasible;
iii. The docks and piers are located so as to not hinder navigation or conflict with overhead transmission lines;
iv. There is minimum feasible interruption of natural water flow patterns;
v. Space between horizontal planking is maximized and width of horizontal planking is minimized to the maximum extent practicable.
vi. The width of the structure is minimized relative to height above the water, to the maximum extent practicable, especially where crossing above vegetated wetlands or submerged vegetation, and except under unusual circumstances the width does not exceed eight feet; and
vii. In lagoons the structure extends no more than 20 percent of the width of the lagoon from bank to bank. [N.J.A.C. 7:7E-4.11(e)(2)].
Similarly, the TRC was required to consider standards relevant to the proposed dredging activities and the placement of dredged material. N.J.A.C. 7:7E-4.11(g), (h).
As the Court in Lusardi observed, these regulations contain "the most detailed expression of this State's policies concerning the appropriate uses of shoreline resources ... [and] [a]lthough [they] do not preempt local zoning authority, they embody carefully considered policies for the use of coastal resources that local officials must take into account in zoning shoreline property within their communities." Lusardi, 86 N.J. at 229, 430 A.2d 881. The Court also pointed out that residential zoning may at times have to "yield to the State policy that public recreational use is, when consistent with environmental concerns, uniquely appropriate" for waterfront areas subject to the regulations. Id. at 230, 430 A.2d 881. Significantly, the express State policy with reference to a "marina mooring" area, such as the one operated by the Seeleys, provides in part: "Any use that would detract from existing or proposed recreational boating use in marina mooring areas is discouraged." N.J.A.C. 7:7E-3.10(c).[6] Moreover, residential development is considered under the regulations as "non-water dependent development" *366 and such development is discouraged in a marina mooring area. N.J.A.C. 7:7E-1.5.
Therefore, the Borough's power to regulate land use of the Seeleys' property and "outshore" of their property is much more narrowly circumscribed than that argued for by plaintiffs who contend that the Borough's residential zoning for lot 18 and the "outshore" land owned by the State should have been paramount in the Board's deliberation and that lot 18, therefore, must be developed for residential purposes.
Now that the Borough's zoning power has been put in proper context we must address the question of whether the erroneous legal conclusions drawn by the Board and trial judge had any impact on the Board's approach to the inquiry and the conclusions reached by it. Plaintiffs imply in their argument that the erroneous decisions concerning preemption and the boundaries of the residential zone placed the Board in a position where it felt compelled to grant the use and bulk variances. We cannot reach that conclusion on this record.
Initially we observe that had the Board felt that it was a captive of the State and that the riparian license and permit issued to the Seeleys for the "outshore" use of State land sealed the fate of the "upland" use, the Board most likely would not have found it necessary for the Seeleys to apply for a use variance. It is clear from the record that, although the DEP determined that the Seeleys' proposed expansion of the marina facilities as they impacted on State land satisfied State policy, the DEP was willing to allow the Borough to consider the extent to which the permitted use of State land would impact on lot 18 and left the ultimate decision on that point to the Borough. The State clearly recognized that the expanded water use encompassed by the license and permit issued to the Seeleys would impact on the upland property upon which the water use depended. The record reflects that the Board also recognized that it had a right to consider that impact insofar as the variances were concerned. Indeed, although the trial *367 judge's remand opinion advised the Board that the residential zone ended at the high watermark, the opinion also advised the Board that it nonetheless was "not preempted from considering structures in the water" to the extent that they impacted on the variances granted.
Although plaintiffs claim in their brief that the trial judge's message to the Board was contradictory and confusing, we do not agree. The judge simply held that the Borough's power to zone stopped at the high watermark (contrary to plaintiffs' position at trial) but that did not mean that the Board was preempted from considering the impact of that "outshore" use on the upland use over which the Board could exercise its zoning power, (contrary to the Board's resolution of June 4, 1986). Thus, the judge in her remand instructions wanted to be sure 1) that the Board had considered those things which it may have previously believed it had been preempted from considering, and 2) that the variances granted did not intrude beyond the high watermark where the Board's power ceased. For that reason, the trial judge requested the Board to determine whether "the variances sought from the Board apply to areas where the Board previously abstained from acting, but that now are found by the Board to be within their jurisdiction, ..." and, if so, consider such additional information "in full." (Emphasis added). The distinction was not lost by the Board. Its resolution of March 1, 1989 confirmed that it was "not ... preempted from considering structures in the water" as they impacted on the variances being sought. The resolution further assured the trial judge that all variances granted only impacted on "the area from the land portion of the premises to the mean high water line." Frankly, that conclusion should have been evident to anyone from a reading of the record since the Seeleys only asked for variances as to lot 18, the boundaries of which stopped at the mean high waterline irrespective of where the zoning boundary ended.
The record further reflects that the Board considered the number of mooring slips permitted by the State in determining *368 the number of parking spaces needed and the number of boats to be stored in the off-season. In addition it did not consider the license issued to the Seeleys as an ultimate expression of the existence of special reasons for its consideration of the use variance. Rather, the Board concluded that the use proposed satisfied the statutory criteria by relying on its independent findings of fact and it exhibited no constraint in doing so because of the number of mooring slips allowed under the State's permit.
Finally, on this issue, it is difficult to perceive on the facts of this case what further action the Board could have taken had it considered that the zoning district boundary, and thus its jurisdiction, extended beyond the high watermark. The only argument plaintiffs make on this subject is that the Board could have maintained the residential use as zoned. However such a conclusion would be indefensible on this record in light of the express State policy contained in the Coastal Resource and Development Policies, N.J.A.C. 7:7E-1.1 to 8.20, discussed earlier, and our Supreme Court's expressions on the subject in Lusardi. Furthermore, the Board could not have imposed conditions on the use variance that would have impacted on such things as dredging, navigation, construction materials or construction design because those matters are exclusively within the jurisdiction of the Army Corps of Engineers and/or DEP. Conceivably, the Board might have some basis to request a reduction in the number of mooring slips approved if it felt the number burdened the upland use unnecessarily. That argument is not advanced by plaintiffs, and, indeed, on this record could not be. The evidence fully supports the Board's conclusion that the number of parking spaces ultimately provided were adequate to support the number of mooring slips permitted.

II
We now move to a consideration of the use and bulk variances granted by the Board. Plaintiffs argue that the *369 Board's decision to grant site plan approval and a use variance with ancillary bulk variances was arbitrary, capricious and unreasonable. Essentially, plaintiffs maintain that the Board failed to adequately set forth its findings in support of its determination to grant the Seeleys' primary application for a use variance and that it then summarily granted the bulk variance request and site plan approval with waivers.
For their part, the Seeleys maintain that because the record before the Board supported its findings that the marina "inherently serves the public good," that a marine use is particularly suitable for their property and that they would suffer a hardship if their variance requests were denied, the Board's decision was neither arbitrary, capricious nor unreasonable and must be affirmed.
We conclude that the evidence presented does not support the Board's findings that the use of the subject property as a marina constituted an inherently beneficial use or that the Seeleys would suffer a hardship if their application was denied. However, we agree with the Board's finding that State policy encourages water-dependent uses of property adjacent to the State's waterways, such as the marina operation here, and, because of that articulated State policy, we hold that the positive statutory component of N.J.S.A. 40:55D-70 was satisfied.
We need not agree with the Board on all of its findings as to special reasons for the variance because "the question is whether the special reasons, taken as a whole, are founded affirmatively in one or more of the zoning objectives set forth in [the statute]." Burbridge v. Mine Hill Tp., 117 N.J. 376, 393, 568 A.2d 527 (1990) (quoting Kramer v. Board of Adj., Sea Girt, 45 N.J. 268, 287, 212 A.2d 153 (1965) (emphasis added). Additionally, there was sufficient evidence before the Board to satisfy the negative statutory criteria. Thus, we affirm the Board's decision granting the use variance.
*370 When reviewing a zoning determination by a board of adjustment, we must give due deference to the board's broad discretion in such matters, and may reverse the determination only if its action was arbitrary, capricious or unreasonable. Kramer v. Board of Adj., Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). It is generally acknowledged that "because of their peculiar knowledge of local conditions" boards of adjustment "must be allowed wide latitude in the exercise of delegated discretion." Id. at 296, 212 A.2d 153; accord, Medici v. BPR Co. 107 N.J. 1, 23, 526 A.2d 109 (1987).
Pursuant to N.J.S.A. 40:55D-70d, a use variance will be granted if: "(1) `special reasons' exist for the variance; and (2) ... the variance can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." Cerdel Construction Co., Inc. v. East Hanover Tp., 86 N.J. 303, 307, 430 A.2d 925 (1981). The statutory phrase "special reasons" has been broadly defined as those criteria that promote the purpose of land use regulation (N.J.S.A. 40:55D-2) and would promote the general welfare. Medici, 107 N.J. at 18, 526 A.2d 109; Andrews v. Ocean Tp. Bd. of Adj., 30 N.J. 245, 251, 152 A.2d 580 (1959). A use that "promotes the general welfare" is one that is particularly suited to its site. This is so because "if the general social benefits of any individual use  without reference to its particular location  were to be regarded as an adequate special reason, a special reason almost always would exist for a use variance." Kohl v. Mayor and Council of Fair Lawn, 50 N.J. 268, 280, 234 A.2d 385 (1967).
Certain educational or institutional uses are so "inherently beneficial" as to promote the general welfare, that special reasons are said to unquestionably exist to grant a variance for those uses. See Medici, 107 N.J. at 12, 526 A.2d 109 (listing cases focusing on inherently beneficial uses). Suffice it to say that the Seeleys' proposed use does not fall easily into any of those categories because, although it serves a public recreational purpose, it is also commercial in nature, though not typically *371 so. Nonetheless, courts have been "most hesitant to find that a commercial use ... inherently promotes the general welfare." Burbridge, 117 N.J. at 394, 568 A.2d 527.
"Undue hardship" in the form of "economic inutility" has also been acknowledged to constitute a special reason to support a use variance. Medici, 107 N.J. at 17 n. 9, 526 A.2d 109; Kramer, 45 N.J. at 286-87, 212 A.2d 153. In the instant matter, the Board found that the Seeleys had suffered a "hardship" because they had purchased the subject property in 1983, based in part, upon the representations of municipal officials that the property could be lawfully used as a marina. The Board reasoned that to now prohibit the Seeleys from using the property for marina operations would work a hardship on them. Those findings are amply supported by the record. Unfortunately, the statutory hardship that gives rise to a "special reason" for granting a use variance does not lend itself to a definitive interpretation but it has been described in these terms: "whether the ... restriction, viewing the property in the setting of its environment, is so unreasonable as to constitute an arbitrary and capricious interference with the basic right of private property." Brandon v. Montclair, 124 N.J.L. 135, 149, 11 A.2d 304 (Sup.Ct. 1940), aff'd 125 N.J.L. 367, 15 A.2d 598 (E. & A. 1940). It is clear that the economic hardship which would be experienced by the Seeleys was not self-created. However, the exact boundaries within which a board of adjustment can consider economic hardship have not clearly been drawn. See Medici, 107 N.J. at 17 n. 9, 526 A.2d 109; Henningsen v. Township of Randolph, 214 N.J. Super. 82, 90-94, 518 A.2d 503 (1986) (Drier, J., concurring in part dissenting in part), rev'd 108 N.J. 175, 528 A.2d 7 (1987). In light of the uncertainty of the soundness of such a determination, even on these facts, we choose not to rely upon "undue hardship" as a special reason to support the use variance. Thus, it is more appropriate to inquire whether the record supports the conclusion that the property in question is particularly and uniquely suited for the continued marina operations. Medici, 107 N.J. at 18, 526 A.2d *372 109; Kohl, 50 N.J. at 279-80, 234 A.2d 385. "Unique suitability" is a well-established category of special reasons. Ward v. Scott, 16 N.J. 16, 22, 105 A.2d 851 (1954).
Given the clearly articulated State policy encouraging recreational uses of waterfront properties for the benefit of all of the State's citizens, as discussed ante in Point I, we hold that special reasons existed to support the Board's grant of the use variance. Our courts have found that certain commercial uses serve the general welfare. See, e.g., Jayber, Inc. v. Municipal Council, 238 N.J. Super. 165, 174-75, 569 A.2d 304 (App.Div. 1990) (senior citizen congregate care housing facility was found to be an inherently beneficial use); Alpine Tower v. Mayor & Council, 231 N.J. Super. 239, 249, 555 A.2d 657 (App.Div. 1989) (commercial radio transmission tower was an inherently beneficial use); Yahnel v. Board of Adj. of Jamesburg, 79 N.J. Super. 509, 518, 192 A.2d 177 (App.Div. 1963), certif. den. 41 N.J. 116, 195 A.2d 15 (1963) (dial telephone service center was an inherently beneficial use). Here, because of State policy that shoreline resources should be utilized for recreational purposes and because use of the property as a marina would satisfy that purpose, operation of a marina at the site serves the general welfare and promotes the zoning purpose of providing recreational waterfront activity for the citizens of New Jersey. N.J.S.A. 40:55D-2g.
In Matthews v. Bay Head Imp. Ass'n, supra, our Supreme Court reaffirmed the recognized statewide policy that "[h]ealth, recreation and sports are encompassed in and intimately related to the general welfare of a well-balanced state." Matthews, 95 N.J. at 321, 471 A.2d 355 (quoting, New Jersey Sports & Exposition Auth. v. McCrane, 119 N.J. Super. 457, 488, 292 A.2d 580 (Law Div. 1971), aff'd 61 N.J. 1, 292 A.2d 545 (1972), app. dism. sub nom. Borough of East Rutherford v. New Jersey Sports & Exposition Auth., 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972)). The Matthews Court determined that, pursuant to the public trust doctrine, private property is not immune from a possible right of access by the public to the *373 foreshore for the purposes of swimming or bathing. Id. 95 N.J. at 333-34, 471 A.2d 355.
As previously noted, our Supreme Court, relying upon the public trust doctrine and recognizing a Statewide policy of encouraging, consonant with environmental demands, greater access to ocean beaches for recreational purposes held that a municipal ordinance prohibiting recreational use of privately owned unimproved oceanfront property was an unreasonable exercise of the zoning power. Lusardi, 86 N.J. at 230, 430 A.2d 881. The Court found that this statewide policy was enunciated in judicial, legislative and executive pronouncements and noted particularly that the most "detailed expression" of this State's policies regarding the appropriate uses of shoreline resources is found in the regulations previously discussed. Id. at 228-29, 430 A.2d 881.
Many of the policies expressed in the regulations were presented to the Board by the Seeleys' professional planning expert. He discussed some of the regulations mentioned here and also discussed State policy papers and studies that incorporated those State policies encouraging water-dependent uses for the public's benefit along the State waterways. The Board found, based in part upon articulated State policies, that the Seeleys had satisfied the positive criteria of N.J.S.A. 40:55D-70d. In our view, the record provides sufficient support for that finding.
We turn now to the second statutory requirement that must be satisfied to justify the grant of a variance  the negative criteria. Before a variance can be granted, it must be demonstrated that the variance will not be a substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance. N.J.S.A. 40:55D-70. In Medici v. BPR Co., supra, our Supreme Court required an additional showing of an "enhanced quality of proof" and specific findings by a board of adjustment with regard to the negative criteria, i.e., that the variance requested *374 is not inconsistent with the intent and purpose of the master plan and zoning ordinance. Medici, 107 N.J. at 21, 526 A.2d 109.
Given the State's policy that recreational water-dependent uses should be made of its waterways, it is plain that the Seeley's marina would not be a detriment to the public good. In fact, just the opposite is true; it would be a benefit to the public good. Plaintiffs themselves did not object per se to the commercial marina and were concerned only with the unsightly view posed by the boats stored on the property in the winter months. The Board accommodated plaintiffs by providing, as a condition to the grant of site plan approval, that applicants erect a six-foot fence and plant Japanese black pines along the easterly boundary of their property. Several neighbors spoke up in favor of the marina stating that it was a well-run operation and an asset to their shore community. Although plaintiffs' professional planning expert maintained that the marina had generated additional noise and traffic, neighboring property owners did not support his assertion.
It is also clear that the Board properly found that the marina would not substantially impair the municipal zone plan. The marina had existed in one form or another on the adjacent lot prior to 1954 and, thus, was a valid nonconforming use. It also appears that lot 18 was utilized by the Seeleys' predecessors for marina purposes without complaint for a number of years. The use was so well accepted that the lot was taxed for commercial use and the Seeleys were advised by Borough officials that the use was permitted when they purchased the property. The marina had clearly been assimilated into the surrounding land use. The Board was justified in concluding that the impact of the expansion would be minimal.

III
Plaintiffs contend that the bulk variances granted by the Board and exceptions from site plan approval were arbitrary *375 and capricious. We have reviewed the record in light of the issues presented and conclude that plaintiffs' argument is clearly without merit except as to one provision of the bulk variance resolution. R. 2:11-3(e)(1)(D). It is worth noting at this point that the Board made findings of fact containing a total of 64 paragraphs in the resolutions of August 5 and December 2, 1987. The findings are amply supported by the record and the conclusions reached by the Board could reasonably have been made on the evidence before it. Burbridge, 117 N.J. at 385, 568 A.2d 527.
However, in its December 2nd resolution the Board granted:
Any other incidental variances required to continue to utilize the premises presently operated as a marina, the storage of boats and the parking of automobiles, in conformance with the Site Plan submitted and the Use Variance approved.
The variance granted in that paragraph resulted in an imprecise delegation of power by the Board to either the applicant or the construction official. See PRB Enterprises, Inc. v. South Brunswick, 105 N.J. 1, 9, 518 A.2d 1099 (1987). As such, that paragraph of the resolution must be stricken as beyond the Board's power.
As modified, the judgment under review is affirmed.
NOTES
[1] The Seeleys had initially requested an interpretation as to lot 16, but later deleted this lot from the Board's consideration. Apparently, it was not disputed that lot 16 had been used as a marina prior to the enactment of the municipal zoning ordinance in 1954 and would not require a variance for its continued use as a marina.
[2] Pursuant to the Federal Clean Water Act (33 U.S.C.A. § 1344), the Army Corps of Engineers is charged with regulating "discharged dredged or fill materials" into United States waters. In addition, under the auspices of the Rivers and Harbors Act of 1899 (33 U.S.C.A. § 403), the Army Corps of Engineers is charged with regulating the performance of work in, or affecting, navigable waters of the United States.
[3] Rule 2:5-1(h) provides in part: "If the validity of a statute, executive order, franchise or constitutional provision of this State is questioned on an appeal, the party raising the question shall mail notice of the appeal to the Attorney General unless he is a party to the appeal or has received notice of the action in the court below." Issues addressing the preemptive effect of State statutes and regulations do not fit squarely within the wording of this rule. Nonetheless, the spirit of the rule suggests that notice be given to the Attorney General in such cases. However, in this case the wording of the applicable regulation and the decisional law on this topic is so clear that we do not feel constrained in deciding the issue presented without the Attorney General's participation.
[4] Interestingly, the same regulations govern permit applications under the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:9-1 to 9-29, and the Wetlands Act, N.J.S.A. 13:9A-1 to 9A-10; N.J.A.C. 7:7-1.1. The trial judge mistakenly believed the Seeleys' permit application was under CAFRA. It was not. The error is of no consequence since the analysis of the regulations is the same.
[5] This is a form of preemption sometimes referred to as "conflict preemption." Feldman v. Lederle Laboratories, 234 N.J. Super. 559, 576-77, 561 A.2d 288 (App.Div. 1989) (petition for certification pending).
[6] "Marina moorings are areas of water that provide mooring, docking and boat maneuvering room as well as access to land and navigational channels for recreational boats." N.J.A.C. 7:7E-3.10(a).