725 A.2d 1173 (1999)
John TUMINO and John Baratta, Plaintiffs-Respondents,
v.
LONG BEACH TOWNSHIP and Long Beach Township Docks and Wharves Committee, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Submitted October 5, 1998.
Decided March 24, 1999.
*1174 Robert E. Rue, Ship Bottom, for defendants-appellants (Shackleton, Hazeltine and Bishop, attorneys; Mr. Rue, on the brief).
John L. Woodland, Manahawkin, for plaintiffs-respondents (Woodland, McCoy & Shinn, attorneys; Anne M. Nachman, on the brief).
Deirdre Schlosser, Deputy Attorney General, for amicus curiae New Jersey Department of Environmental Protection (Peter Verniero, Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Schlosser, on the brief).
Before Judges PETRELLA, CUFF and COLLESTER.
The opinion of the court was delivered by CUFF, J.A.D.
In this appeal, we must determine whether regulations governing coastal zone management promulgated by the New Jersey Department of Environmental Protection (DEP) pursuant to the Waterfront Development Act, N.J.S.A. 12:5-1 to -11, preempt a local ordinance governing the placement and length of a dock. Judge Serpentelli concluded that the basis of the municipality's denial of a permit to construct a dock, its length, was preempted by State law and reversed the decision denying the permit application. The Township and its Docks and Wharves Committee appeal. We affirm.
Plaintiffs John Tumino and John Baratta own waterfront property in the Brant Beach section of Long Beach Township. The property is situated on Little Egg Harbor Bay.
In July 1996, plaintiffs submitted an application for a waterfront development permit to the DEP pursuant to the Waterfront Development Act and the Rules on Coastal Zone Management, N.J.A.C. 7:7E-1.1 to -8.21.[1] Plaintiffs proposed to remove and replace an existing dock, breakwater and bulkhead. The proposed dock would extend 215 feet into the water from the bulkhead and would be capable of mooring two private boats for recreational purposes. The length of the dock was governed by the need to have a minimum water depth of four feet at the point where the boats are moored. N.J.A.C. 7:7E-3.6(b)6vi. The area into which the dock extends is within plaintiffs' riparian grant.
As required by N.J.A.C. 7:7-4.2, plaintiffs provided notice of this application to all owners of property within 200 feet, as well as to the Long Beach Township Environmental Committee, Municipal Clerk, Construction Official and Planning Board. Three property owners submitted written objections to the project. These objections generally expressed *1175 the opinion that the length of the dock would create a hazard by interfering with recreational activities, such as waterskiing, jet skiing and pleasure boating, and would block views of the bay.
DEP requested plaintiffs to reduce a portion of the proposed dock, the "T" terminus for mooring boats. It concluded that the elimination of this portion of the proposed dock was needed to allow vessels to access the mooring areas directly through plaintiffs' riparian grant area rather than through the water area offshore of adjacent properties. On September 25, 1996, plaintiffs requested DEP delete the proposal for the dock and proceed only with the bulkhead proposal. Two days later, DEP issued General Waterfront Permit No. 1517-95-0056.3 authorizing the construction of seventy-five linear feet of bulkhead within eighteen inches of the existing bulkhead.
On February 4, 1997, Tumino submitted an application for an amendment to the issued permit, seeking authorization to construct a new dock and breakwater. Based on a site inspection performed on August 19, 1996, DEP determined that docks existing to the north of the proposed project extended "significantly farther into the water than the proposed dock" and that, therefore, the proposed dock was not a navigational hindrance. Further, DEP noted that the end of the proposed dock was approximately 450 feet from the intercoastal waterway and therefore, posed no interference with navigation. See N.J.A.C. 7:7E-3.7(b)5 (regulation prohibits the placement of structures within fifty feet of any authorized navigation channel unless it can be demonstrated that the proposed structure will not hinder navigation).
DEP issued a Waterfront Development Permit modification (No. 1517-95-0056.4), effective March 12, 1997. The permit modification authorized Tumino to remove the existing dock and breakwater and to construct a new dock measuring four feet wide by 215 feet long, with the "T" section at the terminus measuring seventeen feet long by six feet wide to the north and thirty-four feet by four feet wide to the south. The permit modification also authorized the construction of a thirty-four feet by two feet finger pier parallel to the southern "T" section to accommodate a boat lift, and the construction of fifty-five linear feet of breakwater along the terminus of the "T." The permit noted that its issuance did not obviate the need to obtain any necessary federal or local permits.
The permit also imposed certain physical conditions. It imposed standards for space between horizontal planking, width of the planking, and width of the structure. It specified that no more than two vessels, including jet skis, could be moored at the site. Dredging was not permitted. Finally, the permit established the maximum depth of the breakwater (eighteen inches above the bottom of the waterway) and the minimum spacing between planks (three inches). These conditions are related to the need to provide an unobstructed flow of water and aquatic organisms and to protect the habitat of aquatic organisms.
Upon receipt of the DEP permit, Tumino submitted an application to the Long Beach Township Docks and Wharves Committee (DWC), pursuant to Long Beach Township Ordinance # 94-35C, for a local permit for the same project approved by DEP.
Drawing its authority from N.J.S.A. 40:68-12, the DWC consists of the Township Zoning Officer (who serves as chair of the DWC), Building Subcode Official, Engineer and two residents (one of whom is a member of the Planning Board or Zoning Board of Adjustment), and two alternate members. The Ordinance empowers the DWC to perform the following functions: (1) receive applications for the building of a dock or a wharf within the Township (§ 9-7.1); (2) hold public meetings on a monthly basis (if necessary) to consider these applications (§ 9-7.1); and (3) upon the receipt of federal and state approvals, issue, through the Building Subcode Official, a dock permit (§ 9-7.2). In addition, the Ordinance sets forth requirements regarding plans (§ 9-7.4), construction specifications (§ 9-7.5), elevations and dimensions (§ 9-7.6), clearance from channels (§ 9-7.7), and dimensions exceeding maximum specifications (§ 9-7.8). The Ordinance also establishes fees for applications and inspections to be conducted by the Building Subcode Official (§ 9-7.9). Finally, the Ordinance provides *1176 that any appeal from the DWC decision shall be brought in accordance with N.J.S.A. 40:68-15 (§ 9-7.10).
At the public meeting conducted by the DWC on May 13, 1997, Tumino and his engineering consultant, Joseph Minarik, testified in support of the project. Minarik related that the 215-foot length of the dock was necessary to reach the four-foot minimum depth of water required under DEP regulations. Minarik also testified that the end of the proposed dock would be located approximately 450 feet from the nearest intercoastal waterway and that just beyond 200 feet away from the proposed dock, there were neighboring docks extending beyond the proposed length of the Tumino dock. Minarik also opined that the proposed dock would not pose a hindrance to navigation. When questioned about the possibility of building a shorter dock, Minarik replied that DEP had rejected a proposal to build the dock in three feet of water.
Seven neighboring property owners testified in opposition to the project based on a perceived threat to public safety. At the conclusion of the testimony, four out of five DWC members voted to reject the application because the dock would extend 215 feet into the waterway and, in the DWC's judgment, create a dangerous obstacle to jet-skiers and boaters. In its resolution, the DWC summarized the testimony and emphasized that DEP regulations precluded construction of a shorter dock. Finally, the DWC concluded the proposed dock would create "potential hazards" in violation of the Ordinance and would be "contrary to the general purpose and zoning plan" of the Township.
Tumino and Baratta filed a Verified Complaint in the Superior Court, Law Division, seeking judgment (1) declaring both the Township Ordinance and the DWC's denial of the permit null, void and without full force and effect, and (2) ordering the DWC to issue a building permit for the dock or to declare that none is required. They argued that the DWC was without authority to deny Tumino's application because its authorizing Ordinance attempted to regulate an activity (i.e., the construction of docks) preempted by state law. Further, they cited an opinion of this court, Anfuso v. Seeley, 243 N.J.Super. 349, 368, 579 A.2d 817 (App.Div.1990), which holds that while a municipality can regulate how a dock will impact legitimate upland zoning issues, it cannot regulate the offshore area.
In his written opinion dated July 30, 1997, Judge Serpentelli concluded that the local regulation of the length of the dock was preempted by state statute and rules governing coastal zone management. This appeal followed.
A municipality cannot contradict a policy established by the Legislature. Auto-Rite Supply Co. v. Mayor and Township Committeemen of the Township of Woodbridge, 25 N.J. 188, 194, 135 A.2d 515 (1957). An ordinance will be invalid where it expressly forbids something which is expressly authorized by statute or permits something which a statute expressly proscribes. Summer v. Township of Teaneck, 53 N.J. 548, 554, 251 A.2d 761 (1969). Even without a direct conflict, a municipality may not be permitted to exercise a power where the Legislature has clearly intended to preempt the field. Ibid. The question, therefore, "is whether, upon a survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act." Id. at 555, 251 A.2d 761.
Preemption is a judicially created doctrine which supports the principle that a municipality cannot act contrary to the State. Id. at 554, 251 A.2d 761. Simply because the Legislature has legislated on a particular subject, however, is insufficient in and of itself for preemption to apply. Ibid. To determine whether a municipal ordinance has been preempted, the Court has directed the following inquiry:
1. Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)? *1177 2. Was the state law intended, expressly or impliedly, to be exclusive in the field?
3. Does the subject matter reflect a need for uniformity? ...
4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?
5. Does the ordinance stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Legislature?
[Overlook Terrace Management Corp. v. Rent Control Bd. of the Town of W. New York, 71 N.J. 451, 461-62, 366 A.2d 321 (1976) (quoting Hines v. Davidowitz, 312 U.S. 52, 67-68, 61 S.Ct. 399, 404, 85 L.Ed. 581, 587 (1941)) (citations omitted).]
The Township Ordinance was enacted pursuant to N.J.S.A. 40:68-12. This statute is a section of legislation enacted in 1917 empowering municipalities to undertake waterfront improvements. N.J.S.A. 40:68-12 provides that any private person who desires to construct or alter a wharf, pier or dock must apply for a permit; it provides:
Any person desiring to construct, alter, improve or extend any wharf, pier, dock, bulkhead, or other building in the nature thereof ... shall make written application to the proper officer or body stating the nature and extent of such intended construction, alteration, improvement or extension, and shall file with such application, full and complete plans and specifications thereof.... The governing body of the municipality shall give notice of the time and place of public hearing of such application, to all persons interested.... After such hearing the governing body shall by resolution grant or deny such application, and approve or disapprove the plans and specifications filed therewith....

[N.J.S.A. 40:68-12.]
In 1914, the Legislature also enacted a statute which has become known as the Waterfront Development Act. As amended in 1981, N.J.S.A. 12:5-3a provides that any plans for development of any waterfront upon navigable water or streams of the State or bounding on such bodies of water must be submitted to the DEP and approved prior to installation or construction; it provides:
a. All plans for the development of any waterfront upon any navigable water or stream of this State or bounding thereon, which is contemplated by any person or municipality, in the nature of individual improvement or development or as a part of a general plan which involves the construction or alteration of a dock, wharf, pier, bulkhead, bridge, pipeline, cable, or any other similar or dissimilar waterfront development shall be first submitted to the Department of Environmental Protection. No such development or improvement shall be commenced or executed without the approval of the Department of Environmental Protection first had and received, or as hereinafter in this chapter provided.

[N.J.S.A. 12:5-3a.]
On its face, the Waterfront Development Act is concerned with the regulation of development immediately contiguous to "navigable water." Last Chance Dev. Partnership v. Kean, 119 N.J. 425, 429, 575 A.2d 427 (1990); In re Issuance of a Waterfront Dev. Permit, 257 N.J.Super. 524, 530-31, 608 A.2d 973 (App.Div.1992). The Waterfront Development Act also represents this State's first statutory scheme to regulate waterfront development. It was a direct response to a critical study and report issued by the New Jersey Harbor Commission. As related by the Court in Last Chance, the Commission observed that control over waterfront development was "fragmentary and piecemeal," and that "there has been no supervision whatsoever over the lay-out of piers and other structures with relation to each other, or to the general commerce of the district and port." Last Chance Dev. Partnership v. Kean, 232 N.J.Super. 115, 119-20, 556 A.2d 796 (App.Div.1989) (quoting New Jersey Harbor Commission, Fourth Preliminary Report at 6 (1914)), aff'd, 119 N.J. 425, 575 A.2d 427 (1990). The Harbor Commission recommended that a permanent Harbor Commission or other administrative body be appointed to exercise regulatory authority over the State's waterfront and waterways to revitalize the entire waterfront area and to *1178 facilitate navigation and commerce. Last Chance, supra, 232 N.J.Super. at 120, 556 A.2d 796. The Legislature followed this recommendation by enacting the Waterfront Development Act, for the purpose of "unif[ying] ... `the governance of development that affects commerce in the waters.'" Distributee, Inc. v. New Jersey Dep't of Envtl. Protection & Energy, 274 N.J.Super. 1, 9, 643 A.2d 11 (App.Div.1994) (quoting Last Chance, supra, 119 N.J. at 435, 575 A.2d 427), aff'd, 139 N.J. 431, 655 A.2d 437 (1995).
To remedy port disorganization and to coordinate planning, the Legislature decreed in the Waterfront Development Act that the review of proposals for development and improvement of the waterfront be centralized in one authorityoriginally, the Board of Commerce and Navigation (Board). Last Chance, supra, 232 N.J.Super. at 120-21, 556 A.2d 796. The Board was empowered to investigate the condition of the waterfront, the harbor facilities, and any other matters "incident to the movement of commerce upon all navigable rivers and waters within this state or bounding thereon." N.J.S.A. 12:5-1. The Waterfront Development Act also directed the Board to recommend any measures deemed necessary by it to preserve "proper navigation" or to improve "commerce upon such waters." N.J.S.A. 12:5-1. By amendment in 1975, the Legislature vested DEP with this authority and currently prohibits the commencement or execution of any development or improvement upon or adjoining a waterway without DEP's prior approval. N.J.S.A. 12:5-3.
DEP executes this statutory authority through implementation of the Rules on Coastal Zone Management, N.J.A.C. 7:7E-1.1 to -8.21, which were first promulgated in 1978. The content of these rules reflects the strong societal concern with the unique environmental issues impacting the State's fragile coastal areaa concern which developed and intensified in the intervening years between the Waterfront Development Act's passage in 1914 and the delegation to DEP of responsibility for its implementation in 1975. 22 N.J.R. 1192-93 (April 16, 1990). The purpose underlying these rules is the protection of the coastal ecosystem, an area rich in natural features and a vital component of the State's tourist industry. Id. at 1193. Toward this end, the eight subchapters of the rules cover a wide range of detailed issues affecting coastal zone managementclassification of land and water types into special and general areas, and protective standards for such resources as aquatic plant and animal life, beaches, lagoons, bay island corridors, endangered species, shipwrecks, artificial reefs, wetland buffers, port uses and public access to the waterfront.
The rules require the DEP, when reviewing an application for a waterfront development permit, to consider "various conflicting, competing and contradictory local, State and national interests in diverse coastal resources and in diverse uses of coastal locations." N.J.A.C. 7:7E-1.5(b) (emphasis added). In light of these diverse considerations, the DEP must strike "numerous balances" to accommodate the "broad range of concerns" at play in this area by taking a flexible approach to balance the professional judgment of DEP staff, as well as the recommendations and comments of applicants, public agencies, interest groups, objectors, local government units, corporations and citizens. Ibid. While the policies were intended to avoid arbitrary, unrestrained decision making by the DEP, limited flexibility was intentionally built into the rules to incorporate "professional judgment by DEP officials" in the decision-making process. Ibid.
In evaluating a project, the DEP uses a three-step process applying (1) Location Policies (N.J.A.C. 7:7E-2 to -6), (2) Use Policies (N.J.A.C. 7:7E-7), and (3) Resources Policies (N.J.A.C. 7:7E-8). N.J.A.C. 7:7E-1.5(a). This three parameter approach recognizes that, because coastal land and water areas are ecologically diverse, different policies are required for different locations.
The specific rule pertaining to dock and pier development is N.J.A.C. 7:7E-4.2(e). This rule reads:
(e) Standards relevant to docks and piers (recreational) are as follows:
(1) Recreational and fishing docks and piers are structures supported on pilings driven into the bottom substrate, or floating *1179 on the water surface ... which are used for recreation or fishing or for the mooring of boats....
(2) Recreation docks and piers, including mooring piles, are conditionally acceptable in General Water Areas provided that:
i. There is a demonstrated need that cannot be satisfied by existing facilities;
ii. The construction minimizes adverse environmental impact to the maximum extent feasible;
iii. The docks and piers and their associated mooring piles are located so as to not hinder navigation or conflict with overhead transmission lines;
iv. There is minimum feasible interruption of natural water flow patterns;
v. Space between horizontal planking is maximized and width of horizontal planking is minimized to the maximum extent practicable. Under normal circumstances, a minimum of 3/8 inch, ½ inch, ¾ inch, or one inch space is to be provided for four inch, six inch, eight to 10 inch, or 12 inch plus wide planks, respectively.
vi. The width of the structure shall not exceed twice the clearance between the structure and the surface of the ground below or the water surface at mean high tide ... Under typical circumstances the maximum width of the structure shall be eight feet over water and six feet over marsh, wetlands and mudflats. The height of the structure over wetlands shall be a minimum of four feet regardless of width;

* * *
viii. The proposed structure does not hinder navigation or access to adjacent water areas.
3. The construction ... must comply with the standards specified under the Shellfish Habitat rule (N.J.A.C. 7:7E-3.2).
4. The construction ... must comply [with] the ... Submerged Vegetation rule (N.J.A.C. 7:7E-3.6).

* * *
7. All docks and pier construction must not hinder access to adjacent docks, piers, moorings or water areas.

[N.J.A.C. 7:7E-4.2(e).]
Having outlined the regulatory framework, we now consider whether this elaborate regulatory scheme occupies the field of coastal zone management issues. We conclude that it does.
A simple comparison of the regulations promulgated by DEP governing recreational docks, the principles guiding application of the regulations, and the terms of the Ordinance reveals the numerous points of potential conflict due to State and local control of the siting and design of a dock. The Ordinance establishes design standards and imposes a fifty-foot limit on docks. The Ordinance allows the DWC to grant a variance from its dock length provision but no standards are articulated to grant any variance. Thus, the Ordinance variance procedure does not resolve the potential for conflict. Moreover, this case demonstrates that the potential for conflict is real. Here, the record demonstrates that DEP considered not only environmental concerns (shellfish habitat and submerged vegetation) but also navigational and access concerns and concluded that the project would not impair the environment or constitute an obstacle to navigation or access to neighboring waterfront facilities. The Township and neighboring property owners had an opportunity to express their opposition to DEP to this project and several neighbors expressed concerns about recreational boating safety and access to neighboring docks and moorings. The testimony presented before the DWC by opponents to the dock encompassed the same issues presented to and considered by DEP. Furthermore, the reasons expressed for denial of the dock permit by the DWC encompass the same factors considered and rejected as inconsequential by DEP in its analysis of the project.
In addition, our review of the regulations demonstrates that these rules are intended to exclusively govern the field. With specific reference to docks, N.J.A.C. 7:7E-4.2(d) requires *1180 consideration of not only environmental concerns but also navigational, access and general public health, safety and welfare concerns. Moreover, the preamble to the entire coastal zone management regulatory scheme recites that its very purpose is to consider local and statewide concerns and to achieve a balance of these interests. N.J.A.C. 7:7E-1.5(b). This is highly suggestive of an intent to exercise exclusive control over siting and design criteria for a recreational dock.
Moreover, the subject matter reflects a need for uniformity. The regulations recognize that environmental and navigational concerns have statewide implications which require a uniform approach. Furthermore, the regulations are so comprehensive that little, if anything, is left to municipal control. Finally, decisions made pursuant to the Ordinance may actually frustrate the goal of the coastal zone management rules.
Furthermore, we cannot view N.J.S.A. 12:5-3a in isolation. The Waterfront Development Act governs but one aspect of coastal zone management activities. Many other statutes, including the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, the Wetlands Act of 1970, N.J.S.A. 13:9A-1 to -10, and the statutes governing riparian lands, N.J.S.A. 12:3-1 to -71, form an intricate statutory network governing the use of coastal resources and development in the coastal region. The Rules on Coastal Zone Management, N.J.A.C. 7:7E-1.1 to -8.21, do not implement simply the Waterfront Development Act. Rather, these rules derive their authority not only from the Waterfront Development Act but also the Wetlands Act of 1970, the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, and CAFRA. An examination of this statutory network reveals an unmistakable legislative intention to regulate virtually every aspect of use of coastal resources and development in this critical region.
We, like Judge Serpentelli, recognize that this court held in Anfuso, supra, that local zoning concerns are not preempted by waterfront development regulations. Here, however, the DWC was not concerned with whether a dock should be constructed in this zone but whether the dock would pose a hazard to navigation or impede access by neighbors to their waterfront facilities. The latter issues are within the exclusive control of the DEP.
Finally, we reject the Township's argument that giving preemptive effect to the rules promulgated pursuant to N.J.S.A. 12:5-3a constitutes an implied repeal of N.J.S.A. 40:68-12. We agree that implied repealers are disfavored. Yacenda Food Management Corp. v. New Jersey Highway Auth., 203 N.J.Super. 264, 274, 496 A.2d 733 (App.Div.1985). However, neither N.J.S.A. 12:5-3a nor the coastal zone management rules have repealed N.J.S.A. 40:68-12. Rather, read in context, section 12 is simply one facet of the authority bestowed on a municipality to control its waterfront area. The municipality still maintains this authority subject only to the conditions which may be imposed by regulatory schemes occasioned by the Legislature's response to modern environmental concerns.
Because we conclude that the coastal zone management rules establish a comprehensive scheme governing the siting and design of recreational docks and the DWC denied plaintiffs' permit application for reasons considered and resolved in the DEP review process, the order reversing the decision of the DWC and ordering issuance of a permit for construction of the dock as approved by DEP is affirmed.
Affirmed.
NOTES
[1] Plaintiffs had received the requisite permit from the U.S. Army Corps of Engineers on December 30, 1994.